IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2022

## MYRON LORENZO JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2006-A-396          Mark J. Fishburn, Judge**

_____

### No. M2021-01420-CCA-R3-PC

_____

A Davidson County jury convicted the Petitioner, Myron L. Johnson, of first degree premeditated murder, first degree felony murder, and especially aggravated robbery, and the trial court sentenced him to confinement for life plus sixty years. *State v. Myron L. Johnson ("Johnson I")*, No. M2008-02198-CCA-R3-CD, 2010 WL 521028, at *1 (Tenn. Crim. App., at Nashville, Feb. 12, 2010), *perm. app. denied* (Tenn. May 12, 2010). The Petitioner subsequently filed and adjudicated multiple post-conviction petitions and a habeas corpus petition, for all of which he was not granted relief. In his appeal of his most recent filing, the Petitioner contends that the post-conviction court erred in summarily dismissing his post-conviction petition. He contended below that his convictions could not stand because there was no fingerprint evidence to corroborate the eyewitness testimony. After review, we conclude the post-conviction court properly summarily dismissed the petition and affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and J. ROSS DYER JJ., joined.

Myron Lorenzo Johnson, Clifton, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Glenn E. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Facts and Background
### A. Trial

This case arises from the death of Eugene "Juan" McAdams, who was found by Nashville Metropolitan Police Department ("Metro") officers in the bed of an abandoned truck in 2001. Years later, Metro officers developed the Petitioner as a suspect. Thereafter, for the victim's death, a Davidson County grand jury indicted the Petitioner and two co-defendants for first degree felony murder, first degree premeditated murder, and especially aggravated robbery. The jury convicted the Petitioner as charged.

This court summarized the facts presented at trial as follows:

On July 22, 2001, Detective Brad Corcoran with the Nashville Metropolitan Police Department was called to the scene of an abandoned truck off Old Hickory Boulevard. The body of the victim, Eugene "Juan" McAdams, was discovered in the bed of the truck covered with a white sheet; his ankles and wrists had been duct-taped. Following an autopsy, the cause of death was determined to be asphyxia and blunt force trauma to the head.

Initially, investigators were unable to develop a suspect. Several years later, Alvin Stokes, aka "Brother Gold," was facing federal drug trafficking charges. In the hopes of receiving favorable consideration on his sentence, Stokes provided Detective Derry Baltimore with the names of the [Petitioner], Christopher Nunley, and Paul Anderson as the possible perpetrators of the killing of the victim. Detective Baltimore interviewed Nunley on February 17, 2005. Nunley took Det. Baltimore to the house where the murder occurred, and Det. Baltimore also verified Nunley's phone number. After interviewing Nunley, Det. Baltimore proceeded to interview Anderson on May 12, 2005. Anderson provided details about the murder of the victim.

Anderson testified against the [Petitioner] at trial. Anderson stated that he met the [Petitioner] in 2000, and the two became good friends. Anderson moved into the [Petitioner's] girlfriend's house, and Anderson confirmed that he was drug addict during this time. He had also met Nunley on at least two occasions prior to the murder and knew him as "Skinny." According to Anderson, the [Petitioner] and Nunley were involved together in the sale of drugs, and they often went to Stokes to get drugs.

On July 20, 2001, around 10:00 a.m., the [Petitioner] came over to the place where Anderson was temporarily residing. The [Petitioner] made a proposition to Anderson: In exchange for $500 and an ounce of cocaine, Anderson was to set up a drug deal with the victim and rob him of his drugs and money.

Anderson stated that the [Petitioner] and Nunley were angry with the

2

victim because he had tried to go around them in the drug trade; normally, they would purchase cocaine from the victim for $22,000 and then sell it for $26,000. However, the victim had slipped a note into the cocaine, providing a cell phone number and stating to the second buyer to deal with the victim directly. Anderson did not know the victim prior to July 20.

Nunley called the victim and arranged the deal. The plan was for Anderson to arrive to purchase four ounces of cocaine from the victim, but instead he would rob everyone. They were to later split the drugs and money. The [Petitioner] arrived in his truck with Nunley around 7:00 p.m. that evening to pick up Anderson, and they went to Nunley's house. However, the [Petitioner] and Nunley stated that they wanted to change the amount to eighteen ounces, "a half of key." Anderson no longer wanted to participate because he feared that there would be repercussions for stealing such a large amount of cocaine. The [Petitioner] instructed him to be quiet and sit down; Anderson complied. Nunley phoned the victim requesting the increased amount of cocaine.

While they were waiting on the victim to arrive, the [Petitioner] went out to his truck and retrieved a shotgun and a white bag. Inside the bag was a box of latex gloves. The [Petitioner] placed the bag and the gloves on the top of the refrigerator. The victim then entered the house and asked Anderson, "Do you want to buy some dope?" According to Anderson, the [Petitioner] then jumped up from the table and hit the victim in the head with the butt of the shotgun, rendering the victim unconscious. As soon as the victim fell to the floor, Nunley put on a pair of gloves and began wrapping duct tape around the victim's head. The [Petitioner] also put on gloves. They taped the victim's head "completely up," also taping his hands and feet. When the victim started to come to, he was unable to breathe and began "flopping around just like a fish dying . . . ." The victim soon ceased moving.

The [Petitioner] then removed a gold necklace from around the victim's neck. The [Petitioner] went outside to the victim's truck; meanwhile, Nunley was cleaning up blood on the floor. Thereafter, they carried the victim to a bedroom window and pushed him out the window into the bed of the victim's truck. Nunley handed the [Petitioner] a sheet, which he wrapped around the victim. The men then left the house; Nunley driving the victim's truck, and the [Petitioner] driving his truck with Anderson as a passenger. They drove to Old Hickory Boulevard near Blueberry Hill and left the truck on the side of the road. The [Petitioner] took the victim's compact disc case out of his truck. Nunley got into the [Petitioner's] vehicle, and they returned to the [Petitioner's] girlfriend's house. The [Petitioner] and Anderson showered, and the [Petitioner] collected their clothes. Nunley

3

then left after receiving his share of the cocaine; the [Petitioner] took Anderson back to Anderson's place. The next day, the [Petitioner] gave Anderson cocaine and money and rented [Petitioner] a room in a local motel. [Petitioner] later told Stokes about the murder.

In September 2007, the [Petitioner] and Anderson were being transported on a bus together. Anderson was in protective custody, separated from the [Petitioner] by a cage. The [Petitioner] yelled threats at Anderson, warning him not to testify against him. Inmate Timothy Flener was present on the bus and heard these threats. He was also placed in a cell with the [Petitioner] following the bus ride, and the [Petitioner] told Flener that he and Anderson were involved in a murder together.

The [Petitioner's] wife and former girlfriend in July 2001, Tammi Renee Battle, was shown a box of gloves. She confirmed that the box in the photograph was the same type of gloves that she had brought home from work.

Medical Examiner Dr. Thomas Deering testified as to the victim's cause of the death. He also stated that, when a person was losing the ability to breathe, they might start thrashing around.

A check of Nunley's phone records showed that Nunley phoned the victim on the day of his murder. The victim's phone records revealed that the victim had phoned Nunley several times the evening he was murdered.

Jafton Richardson, an inmate serving a sentence for practicing law without a license, testified that, while incarcerated, the [Petitioner] told him he was involved in a homicide at Nunley's house. The [Petitioner] relayed that there was a phone call to the victim, and he was to meet with them at the house for a drug deal. However, they intended to rob him of his drugs and weapons, but instead the victim was hit in the head with the butt of a shotgun and died. The [Petitioner] also stated that he wore gloves during the robbery and that he got the gloves from his wife who worked at a hospital. According to Richardson, the [Petitioner's] attitude about the murder was "nonchalant."

Later, the [Petitioner] came to Richardson in jail and asked him to sign an affidavit that the [Petitioner] had never spoken to him about the murder. Richardson complied because he feared for the safety of his family.

The [Petitioner] testified on his own behalf, asserting that he had no involvement in the murder of the victim. He denied that he ever knew the victim, asserted that he never sold drugs, and claimed that he never owned a

4

shotgun.

Following the conclusion of the proof, the jury found the [Petitioner] guilty as charged. The trial court merged the felony murder and premeditated murder counts. The [Petitioner] was sentenced to life imprisonment for the murder plus sixty years for especially aggravated robbery.

*Johnson I*, 2010 WL 521028, at *1-3. The Petitioner appealed his convictions based upon evidentiary grounds, and this court affirmed his convictions. *Id.* at *1.

## B. Habeas Corpus Filing

In 2013, the Petitioner filed a petition for a writ of habeas corpus challenging the validity of his sentences. *Myron L. Johnson v. State ("Johnson II")*, No. M2013-02314-CCA-R3-HC, 2014 WL 3696261, at *1 (Tenn. Crim. App., at Nashville, July 24, 2014), *perm. app. denied* (Tenn. Nov. 21, 2014). We dismissed the appeal, filing a Rule 20 memorandum opinion. In it we stated:

The Appellant's sentences have not expired, and there is nothing on the face of the judgments or the record to suggest that the trial court lacked jurisdiction to sentence the Appellant to life imprisonment for his first degree murder conviction and sixty years at 100% as a career offender for his especially aggravated robbery conviction.

*Id.*

## C. Post-Conviction Filings and Facts

Later, the Petitioner sought post-conviction relief based upon an allegation of ineffective assistance of counsel, which the post-conviction court dismissed after a hearing. *Myron L. Johnson v. State ("Johnson III")*, No. M2016-01361-CCA-R3-PC, 2017 WL 1427254, at *1 (Tenn. Crim. App., at Nashville, Apr. 21, 2017), *perm. app. denied* (Tenn. Aug. 16, 2017). The post-conviction court denied his petition, and the Petitioner appealed. *Id.* On appeal, this court affirmed the decision of the post-conviction court, and the supreme court denied him permission to appeal. *Id.*

In 2020, the Petitioner filed a motion pursuant to the Post-Conviction DNA Analysis Act of 2001. *Myron L. Johnson v. State ("Johnson IV")*, No. M2020-01734-CCA-R3-PC, 2021 WL 4521082, at *1 (Tenn. Crim. App., at Nashville, Oct. 4, 2021), *perm. app. denied* (Tenn. Jan. 14, 2021). He alleged that the State had not offered forensic evidence to bolster or substantiate the testimony of its key witness. *Id.* He attached evidence reports showing that the MNPD had gathered duct tape with pieces of latex and separated the latex with liquid nitrogen but no fingerprints were found. *Id.*

The post-conviction court summarily denied the petition finding that the Petitioner "has not made clear which evidence he wishes to have tested." *Id.* at *2. The post-conviction court noted that the Petitioner attached evidence reports to his petition and that the reports referred to latex gloves and duct tape. *Id.* The post-conviction court also noted that, according to the testimony at trial, latex gloves and duct tape were used during the victim's murder. However, the post-conviction Court stated that the Petitioner "has not alleged what DNA found on any of these items would indicate." *Id.* The court concluded that given that the evidence against the Petitioner primarily consisted of eyewitness testimony, "[t]here is no reason whatsoever to believe that the analysis of any of the items . . . would exonerate Petitioner." *Id.* Accordingly, the post-conviction court denied the petition. *Id.* On appeal, this court affirmed the findings of the post-conviction court, and our supreme court denied review. *Id.* at *3, *1.

In September 2021, the Petitioner filed the motion that is the subject of this appeal. The post-conviction motion was based upon the Post-Conviction Fingerprint Analysis Act of 2021. The Petitioner alleged that the evidence against him was based on "an admitted drug addict whose testimony was that the defendant was a friend who gave him shelter and a place to live." He noted that there was no fingerprint evidence that substantiated the witnesses' claims. He noted that there were items gathered by the police that should have had his fingerprints on them, namely a white plastic bag that was put on the victim's head, a box of latex gloves, and a roll of duct tape. The Petitioner said that the record showed that the case against him was not based on physical evidence "but rather coerced testimony from a highly incredible [sic] witness." He requested that analysis of the items be conducted.

The post-conviction court summarily dismissed the petition. It found:

> The Court of Criminal Appeals has already upheld Petitioner's conviction, ruling that there was sufficient evidence to support this conviction. This evidence consisted primarily of testimony of several eyewitnesses, and the proof at trial showed that there were multiple individuals involved in the murder. There is no reason to believe the absence of Petitioner's fingerprints on these items would exonerate Petitioner. Additionally, the appellate court recently upheld the decision of this court to deny testing of possible DNA evidence based on the same argument.

(citations omitted).

It is from this judgment that the Petitioner now appeals.

**II. Analysis**

6

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because fingerprint testing would exonerate him of the charged offenses. The State responds that the post-conviction court properly denied relief to the Petitioner because the post-conviction court correctly determined that the Petitioner did not satisfy the requirements of the Fingerprint Analysis act. We agree with the State.

The Fingerprint Analysis Act provides that:

(a) Notwithstanding part 1 of this chapter, or any other law governing post-conviction relief to the contrary, any appropriate party may, at any time, file a petition requesting the performance of fingerprint analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in a judgment of conviction and that may contain fingerprint evidence.

(b) As used in this section, "any appropriate party" means:

(1) A court on its own motion;
(2) A district attorney general; or
(3) A person convicted of and sentenced for the commission or attempted commission of:

(A) First degree murder;
(B) A Class A felony;
(C) A Class B felony;
(D) Any lesser included offense of an offense in subdivisions (b)(3)(A)-(C); or
(E) Any other offense, at the direction of the court.

T.C.A. § 40-30-403.

The trial court *may* order fingerprint analysis if, after notice to the prosecution and an opportunity to respond, the court finds that:

(1) A reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;

(3) The evidence was not previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-35-405. *Compare* T.C.A. § 40-30-404(1) (the court shall order analysis if "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis").

This court recently interpreted the Fingerprint Analysis Act. *Oscar Smith v. State*, No. M2021-01339-CCA-R3-PD, 2022 WL 854438 (Tenn. Crim. App., at Nashville, Mar. 23, 2022), *no Tenn. R. App. P. 11 application filed.* When so doing, it stated:

This Court concludes the Fingerprint Act's text is clear and unambiguous; thus, we need not look beyond the statute itself to ascertain its meaning. To that end, because the language of the Fingerprint Act mirrors, for the most part, the wording of the Post-Conviction DNA Analysis Act of 2001 (hereinafter "DNA Act"), the trial court looked to case law discussing the DNA Act for guidance in ruling on the instant petition. *Compare* T.C.A. §§ 40-30-301 to -313 with T.C.A. §§ 40-30-401 to -413. We agree with that logical decision. The appellate courts of this state have had ample opportunity over the last twenty years or so to interpret the meaning of the DNA Act.

*Id.* at *13.

The *Smith* court went on to note that:

[A] trial court is not required to hold a hearing to determine whether a petition for [fingerprint] analysis should be granted or denied. *See Charles Elsea v. State*, No. E2017-01676-CCA-R3-PC, 2018 WL 2363589 at *3 (Tenn. Crim. App. May 24, 2018), *no perm. app filed.* Similarly, a petitioner must satisfy all four elements of Section 405 before the trial court will order [fingerprint] analysis. *See* [*Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011)].

*Id.*

8

In the case under submission, we conclude that the post-conviction court did not err when it dismissed the Petitioner's petition because he has not satisfied all four elements of section 405. The first requirement of section 405 is that: (1) "A reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered Petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." T.C.A. § 40-30-405(1). "The definition of 'reasonable probability' has been well-established in other contexts, and is traditionally articulated as 'a probability sufficient to undermine confidence in the outcome'" of the prosecution. *Powers*, 343 S.W.3d at 54 (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) and *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Any testing on the items mentioned by the Petitioner would have revealed one of three results: it would show his fingerprints, it would not show his fingerprints, or it would be inconclusive. The most favorable outcome to the Petitioner would be that his fingerprints would not be on any of the aforementioned items. The absence of his fingerprints, however, would not undermine our confidence in the outcome of the case. There was ample evidence corroborated by multiple witnesses that was sufficient to convict the Petitioner. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

9